**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ALMA FELIX, Individually and on Behalf of All Others Similarly Situated,<br><br>    Plaintiff,<br><br>        v.<br><br>GOLDMAN SACHS GROUP INC. and MORGAN STANLEY,<br><br>        Defendants. | Case No. 1:21-cv-10286-PAC<br><br>ORAL ARGUMENT REQUESTED |
| CHEW KING TAN, Individually and on Behalf of All Others Similarly Situated,<br><br>    Plaintiff,<br><br>        v.<br><br>GOLDMAN SACHS GROUP INC. AND MORGAN STANLEY,<br><br>        Defendants. | Case No. 1:21-cv-08413-PAC |
| TRAVIS FLORIO, Individually and on Behalf of All Others Similarly Situated,<br><br>    Plaintiff,<br><br>        v.<br><br>GOLDMAN SACHS GROUP INC. AND MORGAN STANLEY,<br><br>        Defendants. | Case No. 1:21-cv-08618-PAC |

| | |
|---|---|
| MICHAEL MERSON, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>GOLDMAN SACHS GROUP INC. AND MORGAN STANLEY,<br><br>Defendants. | Case No. 1:21-cv-08752-PAC |
| MARK ULANCH, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>GOLDMAN SACHS GROUP INC. AND MORGAN STANLEY,<br><br>Defendants. | Case No. 1:21-cv-08897-PAC |
| ALISON SCULLY, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>GOLDMAN SACHS GROUP INC. AND MORGAN STANLEY,<br><br>Defendants. | Case No. 1:21-cv-10791-PAC |

KEVIN LEE, Individually and on Behalf of All Others Similarly Situated,

               Plaintiff,

       v.

GOLDMAN SACHS GROUP INC. AND MORGAN STANLEY,

             Defendants.

Case No. 1:22-cv-00169-PAC

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINTS**

**TABLE OF CONTENTS**

I.      INTRODUCTION ...............................................................................................................1

II.     THE SAC CURES THE ALLEGATIONS NOTED BY THE COURT.............................3

    A.      Tippee Liability: Archegos Received Personal Benefits from Tipping MNPI, and
        Defendants Secured Huge Pay Days as a *Quid Pro Quo* ........................................3

    B.      Misappropriation Theory: The SAC Identifies Defendants' Front-Running Trades
        that Were Not Disclosed to or Authorized by Archegos .........................................9

III.    LEGAL STANDARDS ....................................................................................................10

IV.     ARGUMENT.....................................................................................................................11

    A.      The SAC Alleges that Defendants Are Liable as Tippees....................................11

        1.      The Court Correctly Found that Archegos Was an Insider with MNPI,
            and Defendants Cannot Circumvent that Ruling.......................................12

        2.      The SAC Alleges that Archegos Tipped MNPI for Personal Benefits......15

        3.      The SAC Identifies the Tipped MNPI with Sufficient Particularity .........17

        4.      The SAC Alleges that Defendants Knew or Had Reason to Know that
            Archegos Breached Duties to the Issuers ..................................................19

    B.      The SAC Alleges Defendants Are Liable as Misappropriators............................21

    C.      The SAC Alleges Defendants Acted with Scienter...............................................23

    D.      The SAC Alleges Section 20A Claims..................................................................25

    E.      The SAC Alleges Section 20(a) Claims ...............................................................25

V.      CONCLUSION ................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arbitrage Event-Driven Fund v. Tribune Media Co.*,
  2020 WL 60186 (N.D. Ill. Jan. 6, 2020)................................................................................14

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007) ...............................................................................................10, 21

*Chiarella v. United States*,
  445 U.S. 222 (1980) ...........................................................................................................11, 13

*CSX Corp. v. Child.'s Inv. Fund Mgmt. (UK) LLP*,
  292 F. App'x 133 (2d Cir. 2008)............................................................................................12

*DeMarco v. Robertson Stephens Inc.*,
  318 F. Supp. 2d 110 (S.D.N.Y. 2004) ....................................................................................14

*Dirks v. SEC*,
  463 U.S. 646 (1983) .........................................................................................................14, 15

*Elkind v. Liggett & Myers, Inc.*,
  635 F.2d 156 (2d Cir. 1980) ...................................................................................................16

*Energy Factors Inc. v. Nuevo Energy Co.*,
  1992 WL 170683 (S.D.N.Y. July 7, 1992)..............................................................................11

*Feldman v. Simkins Indus., Inc.*,
  492 F. Supp. 839 (N.D. Cal. 1980).........................................................................................14

*Fishbury, Ltd. v. Connetics Corp.*,
  2006 WL 3711566 (S.D.N.Y. Dec. 14, 2006) ........................................................................25

*Gordon v. Sonar Cap. Mgmt. LLC*,
  962 F. Supp. 2d 525 (S.D.N.Y. 2013) ....................................................................................19

*Gruber v. Gilbertson*,
  2018 WL 1418188 (S.D.N.Y. Mar. 20, 2018).........................................................................14

*In re Banco Bradesco S.A. Sec. Litig.*,
  277 F. Supp. 3d 600 (S.D.N.Y. 2017) ....................................................................................25

*In re Bear Stearns Co., Inc. Sec., Derivative, & ERISA Litig.*,
  763 F. Supp. 2d 423 (S.D.N.Y. 2011) ....................................................................................25

*In re Bear Stearns Mortg. Pass-Through Certificates Litig.*,
    851 F. Supp. 2d 746 (S.D.N.Y. 2012) ..................................................................................22

*In re Fannie Mae 2008 Sec. Litig.*,
    891 F. Supp. 2d 458 (S.D.N.Y. 2012) (Crotty, J.)..................................................................10

*In re Revlon, Inc. Sec. Litig.*,
    2001 WL 293820 (S.D.N.Y. Mar. 27, 2001)..........................................................................22

*In re Scholastic Corp. Sec. Litig.*,
    252 F.3d 63 (2d Cir. 2001) ..............................................................................................10, 24

*In re Shanda Games Ltd. Sec. Litig.*,
    2022 WL 992794 (S.D.N.Y. Mar. 31, 2022)..........................................................................12

*In re Take-Two Interactive Sec. Litig.*,
    551 F. Supp. 2d 247 (S.D.N.Y. 2008) ...................................................................................11

*Kaplan v. SAC Cap. Advisors, L.P.*,
    40 F. Supp. 3d 332 (S.D.N.Y. 2014) .....................................................................................25

*Levy v. Southbrook Int'l Invs., Ltd.*,
    263 F.3d 10 (2d Cir. 2001) ....................................................................................................12

*Log On Am., Inc. v. Promethean Asset Mgmt. L.L.C.*,
    223 F. Supp. 2d 435 (S.D.N.Y. 2001) ...................................................................................19

*Moss v. Morgan Stanley Inc.*,
    719 F.2d 5 (2d Cir. 1983) ...............................................................................................12, 13

*Noto v. 22nd Century Grp., Inc.*,
    35 F.4th 95 (2d Cir. 2022) .....................................................................................................19

*Orlan v. Spongetech Delivery Sys., Inc. Sec. Litig.*,
    2012 WL 1067975 (E.D.N.Y. Mar. 29, 2012)........................................................................21

*Puddu v. 6D Glob. Techs., Inc.*,
    2021 WL 1198566 (S.D.N.Y. Mar. 30, 2021)........................................................................23

*Salman v. United States*,
    580 U.S. 39 (2016) .........................................................................................................11, 16

*Sawant v. Ramsey*,
    742 F. Supp. 2d 219 (D. Conn. 2010)..............................................................................12, 14

*SEC v. Alpert*,
    2018 WL 1156012 (S.D.N.Y. Mar. 2, 2018)....................................................................22, 23

*SEC v. Dorozhko*,
    574 F.3d 42 (2d Cir. 2009) ......................................................................................22

*SEC v. First Jersey Sec., Inc.*,
    101 F.3d 1450 (2d Cir. 1996) ...................................................................................11

*SEC v. Jafar*,
    2015 WL 3604228 (S.D.N.Y. June 8, 2015) ............................................................19

*SEC v. McGee*,
    895 F. Supp. 2d 669 (S.D.N.Y. 2012) ...............................................................12, 14

*SEC v. Payton*,
    97 F. Supp. 3d 558 (S.D.N.Y. 2015) .......................................................................17

*SEC v. Obus*,
    693 F.3d 276 (2d Cir. 2012) ..............................................................................*passim*

*SEC v. One or More Unknown Traders in Sec. of Onyx Pharms., Inc.*,
    2014 WL 5026153 (S.D.N.Y. Sept. 29, 2014) ........................................................18

*SEC v. Rockridge*,
    470 F.3d 1 (1st Cir. 2006)........................................................................................23

*SEC v. Suman*,
    684 F. Supp. 2d 378 (S.D.N.Y. 2010) ....................................................................21

*SEC v. Waldman*,
    407 F. Supp. 3d 299 (S.D.N.Y. 2019) ....................................................................21

*SEC v. Watson*,
    2023 WL 2390546 (S.D.N.Y. Mar. 7, 2023)...........................................................15

*SEC v. Wyly*,
    788 F. Supp. 2d 92 (S.D.N.Y. 2011) ......................................................................23

*SEC v. Yun*,
    327 F.3d 1263 (11th Cir. 2003) ..............................................................................15

*Steginsky v. Xcelera Inc.*,
    741 F.3d 365 (2d Cir. 2014) .........................................................................12, 13, 14

*Tan v. Goldman Sachs Grp. Inc.*,
    2023 WL 2753238 (S.D.N.Y. Mar. 31, 2023)......................................................9, 21

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007) ................................................................................................23

*United States v. Blaszczak*,
    56 F.4th 230 (2d Cir. 2022) ...................................................................................11, 16

*United States v. Carpenter*,
    791 F.2d 1024 (2d Cir. 1986) .........................................................................................13

*United States v. Jiau*,
    734 F.3d 147 (2d Cir. 2013) ...........................................................................................17

*United States v. Martoma*,
    894 F.3d 64 (2d Cir. 2017) .............................................................................................15

*United States v. O'Hagan*,
    521 U.S. 642 (1997) ..................................................................................................13, 23

*United States v. Riley*,
    90 F. Supp. 3d 176 (S.D.N.Y. 2015) .............................................................................17

*Veleron Holding, B.V. v. Morgan Stanley*,
    117 F. Supp. 3d 404 (S.D.N.Y. 2015) ...........................................................................22

**Statutes & Other Authorities**

15 U.S.C.
    §78j(b) .............................................................................................................................11
    §78t-1 ..............................................................................................................................11
    §78t(a) .............................................................................................................................11

17 C.F.R.
    §240.13-3(a) ....................................................................................................................12

Victor Brudney, *Insiders, Outsiders, and Informational Advantages Under the
    Federal Securities Laws*, 93 HARV. L. REV. 322 (1979) ...............................................13

Arnold S. Jacobs, 5C *Disclosure and Remedies Under the Securities Laws*
    §12:128 (June 2017) ........................................................................................................23

18 Donald C. Langevoort, *Insider Trading Regulation, Enforcement, and
    Prevention* §§3:3-3:4 (2013) .........................................................................................14

## I.     INTRODUCTION

These coordinated actions allege illicit front-running trades and client tips based on MNPI by Defendants Morgan Stanley and Goldman Sachs ahead of the late March 2021 collapse of Archegos.[1]  Defendants are prime brokers, who by supplying TRS and other services provided the financing and anonymity that Archegos needed to acquire massive beneficial holdings in and control the Issuers' stock.  To secure those services, from which it personally benefitted, Archegos paid Defendants lofty fees and provided them with an array of MNPI – *i.e.*, Archegos's undisclosed, massive beneficial ownership stakes across the Issuers, and that these stakes were built by a TRS trading scheme meant to manipulate the market and evade securities laws.  In late March 2021, Archegos provided the additional MNPI that it faced (yet was unable to cover) billions of dollars in escalating margin calls from Defendants and other counterparties, and that as a result it was about to implode and bring the Issuers' stock down with it.  Archegos provided this MNPI to seek controlled and coordinated sales of the Issuers' stock by Defendants and the other prime brokers, which would benefit it financially, and benefit the prime brokers with higher prices than they would achieve in a fire sale.  But before the truth of Archegos's nonpublic controlling positions and impending collapse reached the public, Defendants exploited all of the MNPI, in breach of duties owed both to the Issuers and to Archegos, and, far beyond Archegos's expectations, unloaded billions of dollars of their own proprietary holdings in a single day.

In its prior order, the Court identified a few discreet gaps in the allegations of the Amended Complaint ("AC") – *e.g.*, regarding personal benefit to Archegos – and then gave clear guidance on what additional detail Plaintiffs should allege to cure those specific deficiencies.  With the SAC,

---

[1]     Unless otherwise stated, all capitalized terms have the same meaning as in the Second Amended Complaints in these consolidated cases ("SAC"), all emphasis is added and internal citations are omitted.  For ease of reference, all citations to "¶__" are to the SAC in *Felix v. Goldman Sachs Grp. Inc.*, No. 1:21-cv-10286-PAC, ECF No. 56.

Plaintiffs provide exactly that and more.  First, under a tipper-tippee theory, Defendants are liable for having traded while in possession of MNPI that Archegos tipped in breach of duties owed to the Issuers, as an insider, with undisclosed massive controlling beneficial ownership stakes in their stock.  The relationships between Archegos and Defendants bear the hallmarks of a *quid pro quo*, for Archegos's market manipulation scheme was entirely dependent on continued prime brokerage services and capacity from Defendants (and other prime brokers), who in return received exorbitant fees from Archegos.  Archegos personally benefitted from providing Defendants the MNPI needed to secure their services, including direct financial benefits, *e.g.*, massive investment gains and losses avoided via the market manipulation scheme itself, but Archegos also leveraged the reputational and other non-pecuniary benefits of its relationships with Defendants to access additional prime brokerage capacity despite its marred history of illegal trading and convictions. When the Archegos house of cards became increasingly tenuous, Archegos provided MNPI to Defendants to seek their cooperation in coordinated sales of Issuer stock, which would benefit Archegos by delaying or moderating its impending default.

Second, under a misappropriation theory, Defendants are liable for front-running Archegos's block trades of its collateral with sales of their own proprietary shares (and tips to hedge fund clients to do the same) – for example on March 24 and 25, 2021 – in breach of duties of confidence owed to Archegos.  While Archegos enlisted Defendants to execute certain confidential block trades of Issuer shares made up of collateral Archegos had provided for its transactions with Defendants, that limited coordination was no license for Defendants to front-run those block trades by surreptitiously selling off proprietary shares not held as collateral or otherwise subject to any such margin or swap contracts with Archegos.  Rather, these shares were independently bought and held by Defendants or their other hedge fund clients for their own

proprietary accounts. Defendants are currently under government investigation for this conduct (known on Wall Street as the "Morgan Stanley Fade"), and Defendants' employees, including the long-time head of Morgan Stanley's block trading, Pawan Passi, have been fired as a result.

With no legitimate answer to these cured allegations, Defendants' motion to dismiss resorts to scattershot misdirection, positing misstatements of law, and strawman mischaracterizations of Plaintiffs' allegations, all with little-to-no analysis of the few deficiencies initially identified by the Court, much less the detailed facts newly alleged to address those deficiencies. Plaintiffs followed the Court's guidance and now allege facts in the SAC sufficient to support each element of their claims. No more is required at this stage. Defendants' motion should be denied.

## II.   THE SAC CURES THE ALLEGATIONS NOTED BY THE COURT

### A.   Tippee Liability: Archegos Received Personal Benefits from Tipping MNPI, and Defendants Secured Huge Pay Days as a *Quid Pro Quo*

With regard to the tipper-tippee claim, the Court held that Plaintiffs had alleged that Archegos is an insider because it "had massive control over the price of [Issuers'] stocks" which were "specifically altered solely through the actions of Archegos" thus "plac[ing] Archegos in possession of MNPI regarding the Issuers' stocks." Op. at 17. However, because the AC did not allege that "Archegos shared this information to seek a personal benefit," the Court dismissed without prejudice. *Id.* The SAC cures this with additional allegations that Archegos received and sought personal benefits for over six months culminating in tips in late March 2021, including:

- "pecuniary benefits it received or anticipated receiving in connection with its swap investments, block trading, margin limits, and other aspects of its market manipulation scheme," such as "investment gains and losses avoided in connection with the stock price increases in the Issuer stocks, the corresponding daily appreciation across Archegos's long TRS positions, the increased margin payments Defendants made and would make to Archegos while its market manipulation scheme continued" (¶¶159-161); and

- "enhance[ment of] its connections to Defendants so as to secure future advantages for its investments, investment strategy and market manipulation

scheme" and its "reputation in order to develop or maintain other business contacts" and "enhance[ment of] Archegos's reputation in order to develop or maintain other business contacts, or access markets or services facilitated by others than Defendants" (¶¶162-63).

The SAC further alleges that in the third week of March 2021, Archegos tipped MNPI with the expectation that Defendants would trade on it by undertaking a controlled and coordinated sale of the Issuers' stock, and thereby specifically sought to benefit from:

- "delay or avoid[ance of] notices of default, to increase the likelihood of an organized winddown among its Counterparties, and otherwise delay or mitigate the negative financial, regulatory, and reputational fallout and consequences of its collapsing market manipulation scheme," and a "standstill agreement" whereby all prime brokers "would agree not to declare Archegos in default while it wound down its positions in an orderly manner" (¶¶153, 164).

Finally, the SAC also alleges that Defendants knew or should have known Archegos was tipping MNPI for unlawful purposes, but nevertheless enabled Archegos's scheme as a *quid pro quo* for enormous fees, and then traded on the MNPI to avoid losses.

Archegos's entire market manipulation scheme depended on two key elements supplied by Defendants: liquidity and anonymity. With regard to liquidity, Archegos, a family office with only $1.5 billion of assets under management before the scheme started, would never have been able to rapidly increase its beneficial holdings in the Issuers' stocks as occurred here on its own – by $8.84 billion from July 1, 2020 to October 1, 2020; by another $14.84 billion from October 1, 2020 to January 1, 2021; and then by $65.97 billion from January 1, 2021 to March 22, 2021. ¶¶82, 87. Defendants and the prime brokers supplied Archegos with the tens of billions of dollars of debt financing, primarily through TRS transactions and margin lending, it needed to make those purchases and gain control of the Issuers' stock. ¶¶95, 123. This drove Archegos's leverage ratio to dangerous levels, and added further risk by concentrating its portfolio in Issuer stock. ¶¶63, 86.

4

Defendants also supplied Archegos the anonymity it needed to conduct its scheme. Using the cover of the TRS, which made purchases of Issuer stock appear in Defendants' (and other prime brokers') names, Archegos did not file any 13F Reports publicly revealing its large positions, despite its beneficial ownership of the Issuers' stock far exceeding disclosure thresholds. For example, it beneficially owned 30% to 70% of Issuers' stock by March 2021. ¶¶83, 93. Making such a public disclosure would have undermined Archegos's ability to control the Issuers' stocks by inducing short-sellers, regulatory scrutiny, and other impediments thereto. Instead, it is now apparent that Defendants' 13F Reports from the second half of 2020 reflected the size of Archegos's frenzied purchasing during that time. ¶¶123-24. Defendants' role in the scheme and supply of TRS thus allowed Archegos to subvert the SEC's disclosure requirements.

In return for the anonymity and liquidity provided by Defendants, Archegos supplied them with MNPI detailing its overall control of the Issuers' stocks. ¶118. Defendants obtained this MNPI when they were supplying billions of dollars of TRS and other transactions to Archegos across the small number of Issuer stocks, which TRS was itself MNPI, allowing Defendants to assess what fees to charge and what margin to extend on those transactions, and was especially important for clients like Archegos that admitted to employing no formal risk controls. ¶¶59-60, 122-23. As Defendant Goldman Sachs acknowledged when discussing Archegos in April 2021, "[w]e have robust risk management that governs the amount of finance we provide for these types of portfolios . . . *in tracking concentration and correlation*, we adjust what it is that we're doing, the level of margin we take, the clients we take in, the pricing we put against that prime." ¶191. Likewise, another prime broker admitted that as part of industry-standard vetting, Archegos routinely provided the MNPI that its holdings of the Issuer stocks were similar across each of its other prime brokers and that its holdings in individual stocks could be well over the disclosure

thresholds, leading the prime broker to conclude that Archegos's overall beneficial holdings in Issuer stocks surpassed that threshold – however, Archegos preferred "anonymity."  ¶¶125-27.

Defendants also knew or had reason to know that Archegos was using the large, anonymous transactions they facilitated to manipulate the Issuers' stock price.  For instance, the Issuers' stock price was skyrocketing in direct proportion to their purchases of those stocks as proprietary hedges on Archegos's TRS; the contemporaneous 13F reports of Archegos's other prime brokers reflected similar purchases of those stocks.  ¶¶110-15, 124.  Defendants also received MNPI showing that Archegos traded in the Issuers' stock on an almost daily basis for extended periods, regularly made trades accounting for more than 20% of the volume for those stocks in a given day, and traded at times that would have the largest price impact on those stocks.  ¶¶101-09.  This was all highly anomalous activity, that for sophisticated parties like Defendants indicated price manipulation.  *Id*.

Defendants and Archegos shared a classic *quid pro quo* relationship for months as Archegos executed its scheme. Simply put, Defendants continued facilitating the frequent and large transactions through which Archegos was manipulating the Issuers' stock in exchange for enormous fees.  As *Bloomberg* reported, "[a]ll that activity made Archegos one of Wall Street's most coveted clients . . . *it was paying prime brokers tens of millions of dollars a year in fees*." ¶65.  The *Financial Times* confirmed that "fee-hungry investment banks were ravenous for Hwang's trading commissions and *desperate to lend him money so he could magnify his bets*." ¶63.  This explains why Defendant Goldman Sachs reversed its policy to avoid funding Archegos due to its history of insider trading and became its prime broker in the second half of 2020 when its trading and the fees therefrom exploded.  ¶¶61, 66.  Indeed, the *Financial Times*, quoting a banker familiar with Archegos and its prime brokers, reported that "*[y]ou get a pretty good understanding of the general situation around Hwang . . . when you look at the way Goldman*

6

*behaved* . . . it's greed trumping fear." ¶68.  Defendant Morgan Stanley chased fees aggressively too, and was the prime broker who carried out the most transactions with Archegos by the time the explosion of trades from July 2020 onward resulted in Archegos's collapse.  ¶67.  As the risks from Archegos's scheme became ever harder to justify, instead of stopping Archegos from undertaking certain transactions, Defendants and the other prime brokers would simply charge excessive terms that Archegos nonetheless paid.  ¶105.  Archegos's payment of exorbitant fees to Defendants was another clear sign that Archegos's trading was manipulative, and that Archegos was paying to secure Defendants' current and future support for its scheme.

The SAC specifically alleges that Archegos expected to and did *personally benefit* from its provision of MNPI to Defendants, including by Defendants then facilitating its control over the Issuers' stock and by driving up their prices.  ¶¶159-60.  Those prices surged from July 2020 to early 2021, in some cases more than doubling – all in the absence of any company-specific news that could account for that surge, and all out of step with the relevant benchmarks such as the NASDAQ-100 Index, which were relatively flat during that time.  ¶¶110-12.  The appreciation in the Issuers' stock benefitted Archegos by improving its financial performance, increasing earnings from its TRS, and positioning it to secure even more transactions on margin.  ¶¶159-60.

But these inflated stock prices also gave rise to a vicious circle: Archegos had to provide more MNPI to and seek more funding from Defendants so that it could make additional purchases of the Issuers' stock and maintain their inflated prices.  Similar to a Ponzi scheme, Archegos could not afford to repay Defendants if the stock it had beneficially purchased on margin at inflated prices dropped in value.  ¶104.  The SAC specifically alleges that Archegos expected to and did *personally benefit* from the additional margin, TRS, and prime brokerage services that Defendants provided later in 2020 and in early 2021, which enabled Archegos to keep purchasing the Issuers'

stock and kept the scheme and Archegos from collapsing.  Further, by associating with leading institutions like Defendants, Archegos *personally benefitted* from reputational enhancements and connections that allowed it to seek additional funding from new prime brokers, which Archegos did until the time it collapsed, and which was particularly important to Archegos given that some institutions were reticent to work with it due to its previous convictions.  ¶¶161-63.

The market manipulation scheme that Defendants facilitated ultimately unraveled. Archegos received a series of escalating margin calls beginning in January 2021, which accelerated further during the week of March 22, 2021, and culminated in Archegos providing Defendants and the other prime brokers with additional MNPI – namely, that it could not meet its margin calls to any of them as of the afternoon of March 24.  ¶¶150-58.  Archegos told this to Defendants because, as it explained on conferences with all the prime brokers on March 25 and 27, it sought to personally benefit from the *controlled and coordinated sale* of Issuer stocks by Defendants and other prime brokers to best preserve their value, which would spare Archegos financial and reputational harm, and maximize the return for its prime brokers.  ¶¶153, 164.

Archegos thus expected Defendants to trade on the MNPI to some limited extent under its coordination, by conducting block trades of collateral shares, to the mutual benefit of Archegos, Defendants and the other prime brokers.  But that is not what happened.  Instead, armed with the MNPI that Archegos could no longer prop up the prices of its massive, leveraged and concentrated beneficial holdings of the Issuers' stock, nor pay them lofty transaction fees, Defendants proceeded to fully exploit that MNPI and trade and tip far *beyond* Archegos's expectation, not in the controlled sale that Archegos sought.  ¶¶181-84.  As the *Wall Street Journal* recounted, "*Morgan Stanley and Goldman Sachs balked at even the idea of [a controlled sale], saying that within a day or two the market would get wind of the amount of stock that needed to be sold and pummel*

*them*." ¶185.  Defendants Goldman Sachs and Morgan Stanley unleashed a nearly unprecedented wave of selling on March 25 and 26, together unloading about $20 billion of the Issuers' stock through bulk trades, reducing their positions therein by 80% and 90%, respectively, and causing the price of that stock to tank.  ¶¶172, 174, 115, 181-85.  Defendants' sales based on MNPI accomplished their intended purpose.  Defendant Goldman Sachs suffered no material losses; as Goldman Sachs' CEO stated, it "got this one right."  ¶¶189, 191.  Defendant Morgan Stanley also would have suffered minor, if any, losses on its Archegos transactions, except that it decided not to sell its Archegos-linked holdings of ViacomCBS, because it was simultaneously leading a secondary offering for that Issuer and recognized that selling its ViacomCBS holdings under those circumstances would expose that it was selling on MNPI. ¶186.  Unlike Defendants, prime brokers who did not sell on MNPI and public investors suffered enormous losses.  ¶190.

**B.     Misappropriation Theory: The SAC Identifies Defendants' Front-Running Trades that Were Not Disclosed to or Authorized by Archegos**

In dismissing the misappropriation claims asserted in the AC, the Court held that, "crucially, Plaintiffs do not point to a single trade executed by Defendants where they did not disclose the trade to Archegos."  *Tan v. Goldman Sachs Grp. Inc.*, 2023 WL 2753238, at \*6 (S.D.N.Y. Mar. 31, 2023).  However, the SAC adds detailed allegations that Defendants, as part of their front-running, were tipping their preferred customers with Archegos's MNPI, that this was never disclosed to Archegos, and that this harmed Archegos.  Specifically, the SAC provides the following new facts regarding the front-running scheme that were not previously alleged: (1) the trading volumes for *each of the Issuers' shares* spiked on March 24, 2021, far exceeding their median trading volumes (¶¶205-07); (2) this spike in trading is a tell-tale sign of front-running of the Morgan Stanley Fade, never disclosed to Archegos (¶205); and (3) Morgan Stanley employee, Pawan Passi, oversaw these sales which caused the trading volumes to spike (*id.*).

9

These new allegations provide additional details on the trades that comprised the Morgan Stanley Fade, performed to benefit Defendants and their preferred clients (not Archegos), and strengthen the inferences that these sales were executed based on confidential MNPI originating from Archegos, and were sales by preferred hedge fund clients tipped off by Pawan Passi and other employees of Defendants. *Id.* For example, on March 24 and 25, Defendants conducted large block trades of Issuers' stock with all the indicators of front-running and the Morgan Stanley Fade. ¶¶179-80, 205-06. On March 24, just before a block trade of Discovery was priced, its shares dropped almost 14%. *Id.* When Passi made another block trade of Discovery shares the next day, the price dropped 7.2%. *Id.* While Archegos was aware of the block trade of Discovery shares, critically, Morgan Stanley did not disclose that it was front-running with ***sales of its own proprietary non-collateral shares or tipping preferred clients***. *See* ¶205 (March 24 trading volume spike reflected front-running block trades and sales by tipped-off hedge fund clients). This is subject to SEC and DOJ investigations. ¶¶210-11.

## III.   LEGAL STANDARDS

At this stage, the Court accepts all factual allegations as true and draws all inferences in the plaintiffs' favor. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd*., 493 F.3d 87, 98 (2d Cir. 2007). The "court only 'assess[es] the legal feasibility'" of the claims alleged; "it does not 'assay the weight of the evidence which might be offered in support thereof.'" *In re Fannie Mae 2008 Sec. Litig*., 891 F. Supp. 2d 458, 469 (S.D.N.Y. 2012) (Crotty, J.), *aff'd*, 525 F. App'x 16 (2d Cir. 2013). Even under Rule 9(b) and the PSLRA, courts still "do not require the pleading of detailed evidentiary matter." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001). While in misrepresentation cases, "the who, what, when, and where of the misrepresentation is required," in an "insider trading case" "some or all of these facts will normally be in the control of the defendants and inaccessible to plaintiffs without the benefit of discovery," and thus courts do not

"require this degree of specificity in an insider trading case." *Energy Factors Inc. v. Nuevo Energy Co.*, 1992 WL 170683, at *3 (S.D.N.Y. July 7, 1992).

Plaintiffs bring claims under §§10(b), 20A, and 20(a) of the Exchange Act.  15 U.S.C. §§78t-1, 78j(b), & 78t(a).  Insider trading violates §10(b) under a first, "classical," theory based on "the duty of trust and confidence insiders ***owe to shareholders***," and prohibits insiders "from trading shares of that corporation based on [MNPI]."  *SEC v. Obus*, 693 F.3d 276, 284 (2d Cir. 2012) (citing *Chiarella v. United States*, 445 U.S. 222, 228 (1980)).  The second theory, "grounded in misappropriation, targets persons who are not corporate insiders but to whom [MNPI] has been entrusted in confidence" and who breach a duty owed "***to the source of the information*** to gain personal profit in the securities market."  *Id.*  Wherever the duty is owed, one receiving MNPI assumes "***a duty to abstain from trading or to disclose the information***."  *Id.* at 285.  Both "also reach situations where the insider or misappropriator tips another who trades on the information."  *Id.*  Section 20A requires "contemporaneous" trading.  *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 309 (S.D.N.Y. 2008).  Section 20(a) requires power to control a primary violator. *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472-73 (2d Cir. 1996).

## IV.    ARGUMENT

### A.    The SAC Alleges that Defendants Are Liable as Tippees

A tippee is liable if: (1) he "had reason to know that the tipper disclosed [MNPI] in breach of a duty and received a personal benefit in the process"; and (2) "the tippee used that [MNPI] by trading or tipping for his own benefit in disregard of that knowledge."  *United States v. Blaszczak*, 56 F.4th 230, 248 (2d Cir. 2022).  "Absent a personal benefit, liability may still attach if the tippee knew the tipper gifted the MNPI with an expectation that he would trade on it."  Op. at 10 (citing *Salman v. United States*, 580 U.S. 39, 42 (2016)).

### 1.    The Court Correctly Found that Archegos Was an Insider with MNPI, and Defendants Cannot Circumvent that Ruling

The Court previously held that Plaintiffs' allegations plausibly plead Archegos's status as an insider of the Issuers (Op. at 17), and because the operative allegations have not changed, that holding is law of the case and should not be revisited now. *See In re Shanda Games Ltd. Sec. Litig.*, 2022 WL 992794, at *3 (S.D.N.Y. Mar. 31, 2022). In any event, the Court's holding is undoubtedly correct. Shareholders with controlling positions like Defendants "are easily characterized as insiders" owing "a general fiduciary duty to the issuers." Op. at 16 (citing *Steginsky v. Xcelera Inc.*, 741 F.3d 365, 370 (2d Cir. 2014)); *Levy v. Southbrook Int'l Invs., Ltd.,* 263 F.3d 10, 16 (2d Cir. 2001). Plaintiffs allege not only that Archegos was the "beneficial owner" of dominant positions across the Issuers' stock,[2] but also that Archegos thereby maintained massive control over the price of the stocks, and that those prices were specifically altered through the actions of Archegos. *Supra* at 4-7. These allegations demonstrate a "level of control that placed Archegos in possession of MNPI regarding the Issuers' stocks." Op. at 17; *see Xcelera*, 741 F.3d at 370 n.5 (a controlling shareholder has "access to information as a result of [its] position of power"). Archegos had far more practical control over the Issuers and their stock than most insiders do, such as a lone director or mid-level executive.

To sidestep the Court's Order, Defendants invent requirements, claiming inside information must be "sourced from the issuers." MTD at 11.[3] That is not the law. In insider

---

[2]    Archegos's TRS exposure gave it "beneficial ownership" positions across the underlying Issuers' stock. *See CSX Corp. v. Child.'s Inv. Fund Mgmt. (UK) LLP*, 292 F. App'x 133 (2d Cir. 2008); 17 C.F.R. §240.13-3(a).

[3]    Defendants ignore the defining characteristic of inside information because they have no response to the Court's ruling that Archegos, with its dominant holdings of the Issuers' stocks and control over their prices, was an insider of the Issuers – and, as such, "material, nonpublic information" involving the Issuers that Archegos possessed based on its insider status was inside information. *SEC v. McGee*, 895 F. Supp. 2d 669, 674-75 (S.D.N.Y. 2012) (illegal to trade in "securities of the corporation using material, nonpublic information [tipper] obtained as a result of his insider position"). Defendants rely on *Sawant v. Ramsey*, but in that case, the "temporary" insider did not "receive[] access" to the MNPI at issue. 742 F. Supp. 2d 219, 238 (D. Conn. 2010). *Moss v. Morgan Stanley Inc.* is

trading law, courts flatly reject such "distinctions premised on the source of the information," for they "undermine the prophylactic intent of the securities laws." *United States v. Carpenter*, 791 F.2d 1024, 1029 (2d Cir. 1986), *aff'd*, 484 U.S. 19 (1987).  Thus MNPI sourced from outside a company, such as the "timing and content of certain [*Wall Street*] *Journal* columns" regarding a company, qualifies as MNPI.  *Id.* at 1033.  A seminal article summarizing insider trading law endorsed by both the Supreme Court and the Second Circuit explains why that is the rule:

> [n]either the history nor the policy of the antifraud provisions (and certainly not their language) confines their coverage to . . . information which comes from within the corporation . . . Other kinds of information, such as market information, may also be material to investment decisions . . . Market information need not come from, or indeed be known at all to, sources "inside" the enterprise . . . .

Victor Brudney, *Insiders, Outsiders, and Informational Advantages Under the Federal Securities Laws*, 93 HARV. L. REV. 322, 330-31 (1979); *United States v. O'Hagan,* 521 U.S. 642, 658 (1997) (citing article).

Similarly, Defendants further claim that MNPI must derive from a special relationship that affords access to confidential information known to the corporation.  MTD at 12.  This just rephrases their posited requirement that MNPI must be sourced from inside the corporation itself, and again fails because the law is the exact opposite.  Even were their claim accurate, it would be no impediment, for Archegos had a special relationship with the Issuers, as their dominant shareholder, which enabled access to inside information, including such key corporate details as the identity of the Issuers' effective owner and the fact that their stock was not trading freely.[4]

---

similarly inapposite because, unlike here, the alleged temporary insider traded on information obtained during an arms-length negotiation.  719 F.2d 5, 13-14 (2d Cir. 1983).  Defendants also mischaracterize *Chiarella*, which held that unlike here, the plaintiffs had not established that a duty flowed between the tippee and the sellers of the securities of the target company, and did not turn on the source of the tipped information.  *Chiarella*, 445 U.S. at 232.

[4]      Defendants' cases are inapposite.  *Xcelera* involved insiders who were officers and directors, and so, in a footnote, it likened controlling shareholders to such employees.  741 F.3d at 370 n.5.  Further, it cites to a treatise which does not say that the information a controlling shareholder has would be identical to that of an officer and

13

Also, the connection of the MNPI to the Issuers was not vague or distant here, as Defendants suggest, but directly impacted the Issuers' performance and ability to carry out important functions, like raising capital – *e.g.*, as ViacomCBS experienced when its secondary stock offering the week of March 22, 2021, tanked owing to the simultaneous liquidation of Archegos's stocks. *E.g.* ¶149.  More fundamentally, MNPI need not rise to some heightened stature Defendants cannot define, rather tipper-tippee liability attaches when an insider has "material, nonpublic information" concerning the corporation, as was indisputably the case here.  *McGee*, 895 F. Supp. 2d at 674.

Nor does Defendants' heavy reliance on a footnote from *Dirks v. SEC* have any applicability here, for it analyzes how "consultant[s] working for [a] corporation" become temporary insiders, not how controlling shareholders like Archegos qualify as insiders.  463 U.S. 646, 655 n.14 (1983); MTD at 12.  Since the third parties at issue in *Dirks* gained their temporary insider status by receiving access to confidential corporate information, their duties to the corporation revolved around that specific corporate information.  *Dirks*, 463 U.S. at 666.  But, controlling shareholders like Archegos become insiders by outsized transactions and corporate ownership, and thereby owe general fiduciary duties, including not to act against the corporation's interests by trading on or exploiting MNPI involving the corporation.  *Xcelera*, 741 F.3d at 370.[5]

director; rather, it says only that controlling shareholders "have the same sort of access to information as a result of their position of power."  *Id.* (citing 18 Donald C. Langevoort, *Insider Trading Regulation, Enforcement, and Prevention* §§3:3-3:4 (2013)).  *Sawant* is distinguishable because there, the plaintiffs had not demonstrated, at summary judgment, that the "temporary insider" shareholder had access to the tipped information.  742 F. Supp. 2d at 238.  *Arbitrage Event-Driven Fund v. Tribune Media Co.* involved a minority shareholder not alleged to have known the MNPI at issue.  2020 WL 60186, at *12 (N.D. Ill. Jan. 6, 2020).

[5]     Defendants mischaracterize the Court's holding in *Gruber v. Gilbertson*, where the finding that Gilbertson was an insider did not hinge on his involvement with the day-to-day business of the issuer, but rather the fact that his position as a controlling shareholder, as well as his day-to-day involvement, gave him massive sway over the issuers' stock price.  2018 WL 1418188, at *17 (S.D.N.Y. Mar. 20, 2018).  Contrary to Defendants' claim, *Gruber* also held that plaintiffs adequately pled defendant's insider status based on its significant equity ownership of the issuer, notwithstanding that defendant did not disclose that it held a controlling stock position.  Also, unlike here, the defendants in *DeMarco v. Robertson Stephens Inc.* were not beneficial owners of the issuers' stock and owed no duties.  318 F. Supp. 2d 110, 122, 127 (S.D.N.Y. 2004).  So too in *Feldman v. Simkins Industries*, *Inc.*, defendant was not a controlling shareholder.  492 F. Supp. 839, 844 (N.D. Cal. 1980).

Finally, Defendants' argument that no liability arose if Archegos provided MNPI in furtherance of a legitimate business purpose – transacting in securities – is nonsense. MTD at 11-12. The transactions that Archegos undertook were part of its broad scheme to manipulate and control the Issuers' stocks, *i.e.*, archetypical illicit conduct. This is not a situation where a prime broker merely carries out a routine transaction and happens to obtain some innocuous information from a counterparty; rather, liability attaches because Defendants exploited MNPI received from an insider seeking its own personal benefits. *Supra* at 6-9.

### 2.    The SAC Alleges that Archegos Tipped MNPI for Personal Benefits

With Archegos's status as an insider confirmed, the other elements of tipper-tippee liability are readily satisfied. *See Obus*, 693 F.3d at 286. Archegos's alleged personal benefits are not subject to scienter or the heightened pleading standard, *id.*, and the Second Circuit has instructed that "[i]dentifying personal benefits is not, however, the central focus of insider trading law, but simply how courts and juries analyze breaches of fiduciary duty," *United States v. Martoma*, 894 F.3d 64, 73 (2d Cir. 2017). The "test for a personal benefit is whether objective evidence shows that 'the insider personally will benefit, directly or indirectly, from his disclosure'" of MNPI to the tippee. *Id.* (quoting *Dirks*, 463 U.S. at 662). "[P]ersonal benefits may be indirect and intangible and need not be pecuniary at all." *Id*. at 74; *SEC v. Watson*, 2023 WL 2390546, *3 (S.D.N.Y. Mar. 7, 2023) ("defined personal benefit broadly"). "[W]hether a tipper expected to benefit personally from a particular disclosure is a question of fact." *SEC v. Yun*, 327 F.3d 1263, 1280 n.38 (11th Cir. 2003).

The SAC alleges Archegos tipped MNPI for a variety of personal benefits, including (1) to obtain the financing and anonymity needed to control and inflate the Issuers' stocks, and the pecuniary benefits it expected to and did initially receive therefrom. *Supra* at 7. Then, when the scheme came under pressure, Archegos continued to tip in exchange for benefits such as (2)

15

expanded financing, TRS and prime brokerage services that enabled it to maintain the scheme, and also for reputational benefits that enabled it to secure additional prime brokers. *Supra* at 7-8. This was a *quid pro quo* relationship, with Archegos securing current and future support for its scheme, which Defendants understood was growing increasingly risky, in exchange for paying Defendants exorbitant fees to keep going along with it. *Supra* at 6. Further, when Archegos ultimately could not meet margin calls in March 2021, it tipped MNPI to Defendants for the personal benefit of (3) a controlled and coordinated sale of its assets across the prime brokers to minimize its financial and reputational harm, while they secured more favorable prices than in a fire sale. *Supra* at 8.

Defendants argue, incorrectly, that these allegations do not plead a personal benefit because Archegos did not "expect" them to trade on the MNPI it provided. MTD at 14. First, as a legal matter, a tipper acts improperly if it tips MNPI **either** to secure a benefit **or** with the expectation that the tippee would trade. *See Obus*, 693 F.3d at 287; *Elkind v. Liggett & Myers, Inc.*, 635 F.2d 156, 167 (2d Cir. 1980) (personal benefit is alternative basis for improper tipping as compared to "[o]ne who intentionally places [MNPI] in the hands of individuals able to use it to their advantage on the market has the requisite state of mind"). The Court so held as well. Op. at 10 (citing *Blaszczak*, 56 F.4th at 646, and *Salman*, 580 U.S. at 42). Whether or not Defendants were expected to trade, Archegos expected to and did personally benefit from tipping MNPI.

Second, in any event, the SAC does allege that Archegos expected Defendants to trade on the MNPI: it sought Defendants' participation in a controlled and coordinated sale of the Issuers' stock in late March 2021, after informing all of its prime brokers that it could not meet their margin calls. *E.g.*, ¶153 ("Archegos . . . asked Defendants . . . to enter into a standstill agreement whereby they would agree not to declare Archegos in default while it wound down its position in an orderly manner."); ¶167 (Archegos requested that Defendants "coordinate a managed winddown, and

16

otherwise coordinate the trading it anticipated might occur by Defendants."). Irrespective of Defendants' decision to turn down Archegos's request, Archegos still expected Defendants to trade and sought a benefit, as a result of tipping Defendants that MNPI.

Defendants' argument, that there is a "fundamental mismatch between the timing of" the benefits that Archegos sought to receive and the timing of the unlawful trading, fails as well. MTD at 15. It is just another articulation of Defendants' meritless claim that Archegos must have expected a trade in order to receive a personal benefit. There is no requirement that the benefit the tipper hopes to receive aligns temporally with the illegal insider trading. Tips and trades can occur after past benefits, in anticipation of future benefits, or in other sequences and permutations. *See, e.g.*, *SEC v. Payton*, 97 F. Supp. 3d 558, 563 (S.D.N.Y. 2015) (alleged benefit "occurred more than a month after the insider trading"); *United States v. Riley,* 90 F. Supp. 3d 176, 184 (S.D.N.Y. 2015) ("the tipper's gain does not have to be '*immediately* pecuniary'" and "[t]he precise exchange need not be known by the parties at the time of the tip"), *aff'd*, 638 F. App'x 56 (2d Cir. 2016); *United States v. Jiau,* 734 F.3d 147, 153 (2d Cir. 2013) ("[t]he proof required to show personal benefit to the tipper is modest," so mere "opportunity to access information that could yield future pecuniary gain" is "sufficient to justify an inference of personal benefit"). As such, with respect to the period before late March 2021, Archegos tipped MNPI to Defendants and paid exorbitant fees not just to maintain its scheme, but also to secure support for the scheme in the future if it came under more pressure. ¶164. In late March 2021, Archegos tipped MNPI, so that Defendants would contemporaneously engage in the controlled sale of Issuer stock – this was also the payoff for its earlier *quid pro quo* payments to Defendants – which would benefit Archegos financially and preserve its reputation so that it could potentially reorganize. ¶¶153, 164.

### 3.     The SAC Identifies the Tipped MNPI with Sufficient Particularity

Alleging that MNPI passed from a tipper to a tippee is subject to a "relaxed" Rule 9(b) standard. *See SEC v. One or More Unknown Traders in Sec. of Onyx Pharms., Inc.*, 2014 WL 5026153, at \*3–5 (S.D.N.Y. Sept. 29, 2014) ("Rule 9(b) may be relaxed to allow a plaintiff to plead facts that imply the content and circumstances of an insider tip.").

The SAC easily meets this burden. It provides extensive detail regarding the nature of the MNPI that Defendants were tipped, including: the large amounts of Archegos's beneficial holdings of the Issuers' stock that they personally supplied; that those holdings were primarily in anonymous TRS; that those holdings were highly leveraged; that Archegos had similar positions at its other prime brokers; that Archegos asked them to carry out atypical trading patterns in the Issuers' stock associated with manipulation; that the value of the TRS they held for Archegos was increasing in direct proportion to the ever-growing supply of TRS they issued it; and that Archegos was willing to pay them exorbitant fees for additional financing. *Supra* at 4-8.

Defendants' claim that these allegations are conclusory is belied by the fact that the allegations are based in substantial part on Defendants' own actions, statements, and reports. MTD at 15-16. For example, the increase in their issuance of TRS to Archegos and Archegos's ballooning exposure to the Issuers' stock is evidenced by their own 13F Reports and by a report from European regulators that monitored Defendants' and the prime brokers' TRS. ¶¶95-99, 123. Goldman Sachs also said that it sought the foregoing information as part of its successful diligence process for Archegos. *Supra* at 5. Perhaps most telling, Defendants would not have rushed to sell about $20 billion across the Issuers' stock on March 26, 2021, if the MNPI they received had not indicated the extent of Archegos's concentrated positions across the prime brokers.

In turn, Defendants' related argument that the tipping allegations are all based on the Credit Suisse Report is an obvious strawman and is untrue, as detailed above. That said, Defendants

18

cannot simply wish the Credit Suisse Report away – it provides details of Archegos's *modus operandi* with respect to prime brokers like Defendants that are consistent with Defendants' actions here, and with the reporting of leading financial journals cited throughout the SAC. *E.g.*, ¶64 (*Financial Times* quoting an executive of one of the prime brokers, "[i]t's inconceivable . . . that we were not aware of the other banks' positions"); ¶119-120.[6]

### 4. The SAC Alleges that Defendants Knew or Had Reason to Know that Archegos Breached Duties to the Issuers

There are two elements of tippee liability, and no dispute as to the first one – that Defendants traded the Issuers' stocks based on the information they received from Archegos, which, as the Court found, was MNPI. *Supra* at 12. The SAC also readily pleads the second tippee element, that Defendants "knew or **had reason to know** that [they] improperly obtained the MNPI (*i.e.*, that the information was obtained through the tipper's breach)." *Obus*, 693 F.3d at 286. This entails a lower showing of scienter than is typical for fraud, and a "fact-specific inquiry turning on the tippee's own knowledge and sophistication." *Id.* at 288; *SEC v. Jafar*, 2015 WL 3604228, at *4 n.2 (S.D.N.Y. June 8, 2015) ("negligence standard," *i.e.*, "knew or should have known," applies to "the tippee's knowledge that the tipper breached").

Here, the relevant inquiry is whether Defendants had reason to know of Archegos's large positions in and control over the Issuers' stocks, because that is the source of Archegos's insider status and duties to the Issuers. *Supra* at 12. The SAC amply details why Defendants, at a minimum, had reason to know that information. For example, Defendants were personally financing enormous, leveraged and undisclosed beneficial holdings in the Issuers' stocks, as their

---

[6]    Defendants' cases are distinguishable. *Noto v. 22nd Century Grp.* does not address allegations describing MNPI. 35 F.4th 95, 104 (2d Cir. 2022). *Log On America, Inc. v. Promethean Asset Management L.L.C.* described the MNPI only as information "relating to their financing options, business plans and contingent liabilities." 223 F. Supp. 2d 435, 447 (S.D.N.Y. 2001). In *Gordon v. Sonar Capital Management LLC*, the complaint alleged only that the tipper "repeatedly and consistently . . . provided [tippees] with" MNPI. 962 F. Supp. 2d 525, 529 (S.D.N.Y. 2013).

contemporaneous 13F Reports reflect, and were paid exorbitant fees to do so.  Similar purchases were also reflected in the public 13F Reports of Archegos's other prime brokers, and Archegos had a practice of informing its prime brokers that its holdings were concentrated in a similar manner across all of them, which was information Defendants admitted seeking from Archegos. The Issuers' stock prices were exploding at the same time that Defendants were facilitating those massive purchases, and those purchases were the only explanation for that dramatic increase. Further, the trading pattern Archegos instructed Defendants to undertake was clearly designed to maintain the inflated prices of its enormous beneficial holdings – such as Archegos's willingness to acquire more beneficial holdings even with fees so large that it would be difficult to profit from those transactions, and trading large volumes of the Issuers' stocks on an almost daily basis.  *Supra* at 4-8.  As sophisticated market participants, all of this gave Defendants reason to know that Archegos beneficially owned large percentages of the Issuers' stock and was controlling it.

Defendants' only response is to ignore the applicable "reason to know" standard, which is plainly satisfied, and assert that the SAC does not sufficiently allege they "knew" the foregoing information, which is not required.  MTD at 17-18.  Moreover, Defendants did not need to know the exact size of Archegos's aggregate holdings in order to have ***reason to know*** that Archegos's holdings were substantial and large enough to control the Issuers' stock prices, which the information Defendants had clearly indicated was occurring.  The snippets Defendants crib from the government proceedings are unavailing for the same reason – even if Archegos did not provide completely accurate information to Defendants, they still had more than sufficient information indicating and reason to know of Archegos's enormous holdings and control of the Issuers' stock. In addition, Defendants improperly contradict the SAC when they assert that the only information they knew following the March 25 and 27 conference calls was that Archegos had net liabilities of

20

about $110 billion.  To the contrary, the SAC alleges that, building on all of the information

discussed above, those conference calls confirmed the large size of Archegos's beneficial holdings

of the Issuers' stocks and that they were spread across all of its prime brokers, otherwise there

would be no reason to set up a call with the prime brokers to coordinate the sale of those stocks.

*Supra* at 4-9.  Nor would there have been a reason for Defendants to surreptitiously unload $20

billion of those stocks the next day.  ¶¶181-85.  The SAC's allegations easily satisfy the reason to

know standard.  *SEC v. Waldman*, 407 F. Supp. 3d 299, 311 (S.D.N.Y. 2019) ("factfinder to

determine whether Defendants knew or should have known that the tip" breached fiduciary duty).[7]

## B.    The SAC Alleges Defendants Are Liable as Misappropriators

Plaintiffs alternatively allege that Defendants misappropriated MNPI they received from

Archegos, trading and tipping for their own purposes in breach of duties they owed to Archegos.

¶¶203-19.[8]  To plead misappropriation, Plaintiffs must allege: (1) defendant possessed MNPI; (2)

which he was duty-bound to keep confident; and (3) he breached his duty by acting on or revealing

the MNPI.  *SEC v. Suman*, 684 F. Supp. 2d 378, 387 (S.D.N.Y. 2010), *aff'd*, 421 F. App'x 86 (2d

Cir. 2011).  Again, there is no dispute that Defendants possessed MNPI.  *See* MTD at 18-21.

The SAC alleges that Defendants had a duty to keep Archegos's MNPI confidential.  That

duty arises from "the parties' history, pattern, practice, course of dealing, or relationship with

regard to the prime brokerage, margin lending, and other brokerage-client relationships, services,

and transactions," as well as Defendants' "own corporate policies and practices" with regard to

---

[7]    Defendants cases are inapt.  *ATSI* is a market manipulation case in which the plaintiff did not allege particular facts that defendants manipulated the market.  493 F.3d at 102.  *Orlan v. Spongetech Delivery Sys., Inc. Sec. Litig.* simply holds scienter cannot be pled as to a group.  2012 WL 1067975, at *11 (E.D.N.Y. Mar. 29, 2012).  Here, Plaintiffs are not relying on the group pleading doctrine by citing to facts in the Credit Suisse report.  It reflects practices of Archegos and its prime brokers, including Defendants, supporting reasonable inferences at this stage.

[8]    The Court did not dismiss the misappropriation claims with prejudice.  MTD at 18-19 & n.8.  "This dismissal [is] without prejudice as leave to amend should be freely given."  *Tan*, 2023 WL 2753238, at *10.

21

those transactions between them and Archegos. *See* ¶¶216-19. These allegations are sufficient to allege Defendants owed a duty of confidence to Archegos. *SEC v. Alpert*, 2018 WL 1156012, at *3 (S.D.N.Y. Mar. 2, 2018); *Veleron Holding, B.V. v. Morgan Stanley*, 117 F. Supp. 3d 404, 419 (S.D.N.Y. 2015); *SEC v. Dorozhko*, 574 F.3d 42, 49 (2d Cir. 2009).

The only genuinely disputed issue regarding the misappropriation claim is whether Defendants breached their duty to maintain Archegos's MNPI in confidence. On this point, the SAC specifically alleges such breaches with trades Defendants did not disclose to Archegos: on March 24, 2021, trading volume spiked for each of the Issuers due to Defendants' front-running trades and tips ahead of anticipated block trades (¶205); Pawan Passi and other employees were personally involved in these trades and tips on March 24 and 25, 2021, including for example trades and tips that depressed the price of Discovery by 7.2% *ahead* of block trading (*id.*); such front-running tips and trades were counter to Archegos's interests and not disclosed to or directed by Archegos (¶¶206, 215); the SEC and DOJ are probing insider trading related to these and other Issuer trades by Defendants leading up to Archegos's collapse, including "whether employees shared or used information regarding impending block transactions in violation of securities regulations" (¶¶207-11); and in response, Morgan Stanley terminated at least two employees implicated in the probes (¶¶212-13). These allegations suffice, as Plaintiffs "need not plead dates, times, and places with absolute precision." *See In re Revlon, Inc. Sec. Litig.*, 2001 WL 293820, at *8 (S.D.N.Y. Mar. 27, 2001). The "specific facts are 'peculiarly within the knowledge of defendants,'" so requirements are "'relaxed' to allow circumstantial evidence to plead the specific content and circumstances of insider tips." *Alpert*, 2018 WL 1156012, at *2.[9]

---

[9]     Defendants also urge the Court to ignore "news articles about unrelated government investigations into block trading." MTD at 19. But Plaintiffs may support their allegations with both news articles and allegations in government investigations. *See, e.g., In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d

22

Defendants' argument that "Archegos itself 'directed' defendants and other counterparties to sell 'hundreds of millions of dollars of' its 'concentrated positions' on those same days," *i.e.*, to make ***block trades*** (MTD at 19-20), ignores that Defendants were ***front-running*** block trades or ***tipping off favored customers*** to do so, wholly outside of Archegos's direction or knowledge. ¶¶205-15.  This front-running involved sales of Defendants' proprietary hedged positions, as well as sales by tipped clients, well beyond Archegos's expectation of limited and coordinated block trades of its own collateral, and harmed Archegos by reducing the proceeds of its block sales.  *Id*. Thus those sales did not entail the "full disclosure" necessary to avoid misappropriation liability. *O'Hagan*, 521 U.S. at 655; Arnold S. Jacobs, 5C *Disclosure and Remedies Under the Securities Laws* §12:128 (June 2017) ("Disclosure of an intent to trade will not be adequate if the defendant tips"); *SEC v. Wyly*, 788 F. Supp. 2d 92, 126 (S.D.N.Y. 2011) (partial disclosure insufficient); *SEC v. Rockridge*, 470 F.3d 1, 12 (1st Cir. 2006) ("disclosure . . . as to one set of actions" does not "render[] all [other] deceptive acts non-deceptive").

### C.    The SAC Alleges Defendants Acted with Scienter

Scienter is satisfied by "conscious misbehavior or recklessness" or "motive and opportunity."  *Puddu v. 6D Glob. Techs., Inc.*, 2021 WL 1198566, at \*11 (S.D.N.Y. Mar. 30, 2021).  Allegations need not be "of the 'smoking-gun' genre," rather, a complaint suffices "if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322-24 (2007).  When Defendants traded and tipped in possession of MNPI, they did so with the knowledge that Archegos's massive beneficial ownership likely rendered it

---

746, 768 n.24 (S.D.N.Y. 2012) (even under PSLRA, complaints may "unquestionably rely on [factual information] mentioned in a news clipping or public testimony").  Indeed, the articles cited are particularly apt, mentioning Defendants specifically in connection with front-running, block trading, and tipping. *See, e.g.*, ¶¶207-14.

an insider and thus that trading on MNPI received from Archegos breached duties owed to the Issuers. *Supra* at 19-21. Further, Defendants traded on the MNPI, in breach of duties owed to the Issuers and Archegos, knowing that: (1) Defendants had entered into prime brokerage and related agreements with Archegos that depended on keeping MNPI confidential (¶216); (2) they acknowledged in communication that this MNPI was confidential (*id.*); (3) they had policies and practices of keeping such MNPI confidential (¶217-18); (4) Archegos specifically told Defendants to keep its MNPI confidential (¶219); and (5) Defendants "balked at even the idea of" an orderly winddown because "within a day or two the market would get wind of the amount of stock that needed to be sold and pummel" them (¶185). These facts suffice. *Obus*, 693 F.3d at 287.

Moreover, by serving as both Archegos's prime broker and as an underwriter of ViacomCBS's March 2021 secondary offering, Morgan Stanley created a conflict of interest because it knew that ViacomCBS shares would plummet if Archegos was forced to sell its massive positions therein. ¶¶149, 186. But – in contrast to the actions it took with the other Issuers – Morgan Stanley *confirmed* that it did not immediately sell ViacomCBS shares for several days so that it could keep the price of those shares inflated and profit as the lead underwriter. ¶¶187, 193. After the offering closed, Morgan Stanley pounced, unloading its massive holdings onto purchasers in the offering. *See id.* Goldman **also** held off on selling most of its ViacomCBS shares until *after* the offering. ¶186. Defendants' careful approach to ViacomCBS demonstrates that they knowingly traded and tipped in breach of fiduciary duties to Archegos and the Issuers.

The SAC also alleges motive and opportunity. The massive losses avoided that Defendants stood to reap from their front-running trades were "concrete benefits." *Scholastic*, 252 F.3d at 74. The "amount" of losses avoided and huge "volume" of sales shows their motive. *Id*. And, Defendants tipped clients to mitigate losses and attract future business. ¶¶204-15. The inference

24

that Defendants sought personal benefit is more compelling than any opposing inference.  That avoiding losses makes economic sense is no basis to presume front-running trades were "legitimate business steps."  MTD at 23-24.  Profitable fraud is still fraud.  *See Obus*, 693 F.3d at 286-87.

### D.     The SAC Alleges Section 20A Claims

The SAC alleges the *Felix* and *Scully* Lead Plaintiffs traded "contemporaneously." *Compare* ¶¶276-84, *with In re Bear Stearns Co., Inc. Sec., Derivative, & ERISA Litig*., 763 F. Supp. 2d 423, (S.D.N.Y. 2011).[10]  Defendants argue those Plaintiffs' March 24 purchases were before the alleged March 26 illicit sales.  MTD at 24.  But the March 26 sales are not the only ones alleged, Plaintiffs also allege illicit sales and tips on March 24.  *See, e.g.*, ¶¶80, 82.  Defendants contend the March 24 sales were not insider trades because Archegos "directed" block trades. MTD at 24-25.  Agreeing to block trades is not license to front-run them with misappropriated MNPI.  Also, "various transactions can make up one violation" – trades must be assessed collectively.  *Kaplan v. SAC Cap. Advisors, L.P*., 40 F. Supp. 3d 332, 342 (S.D.N.Y. 2014).

### E.     The SAC Alleges Section 20(a) Claims

Plaintiffs allege Defendants' "specific employees" – *e.g.*, Pawan Passi – under government investigation undertook the alleged trades and tips, and were fired as a result.  *Compare* MTD at 25, *with* ¶¶310-13.  No more is required.  *See In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 669 (S.D.N.Y. 2017) (status as "employer, giv[es] rise to the presumption of control").

## V.     CONCLUSION

For all these reasons, Defendants' motion should be denied.

---

[10]     At this stage, these allegations suffice.  But should the Court find any deficiency, the PSLRA contemplates Lead Plaintiffs, "at the class certification stage," seeking "the appointment, if necessary and desirable, of additional class representatives as the litigation proceeds."  *See, e.g., Fishbury, Ltd. v. Connetics Corp*., 2006 WL 3711566, at *4 (S.D.N.Y. Dec. 14, 2006) ("If certain class claims cannot be advanced because of standing or class-certification issues, this deficiency can be corrected by the designation of other members of the purported class as named plaintiffs or class representatives.").  Here, Lead Plaintiffs reserve their right to add additional class representatives if need be.

DATED:  September 15, 2023

Respectfully submitted,

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

*/s/ Max. R. Schwartz*

Max R. Schwartz
Marc J. Greco
Emilie B. Kokmanian (*pro hac vice*)
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: 212-223-6444
Facsimile:  212-223-6334
mschwartz@scott-scott.com
mgreco@scott-scott.com
ekokmanian@scott-scott.com

*Lead Counsel for the IQIYI Class, Co-Lead Counsel for the Discovery Class and Co-Chair of the Executive Committee*

**HEDIN HALL LLP**

*/s/ David W. Hall*

David W. Hall (*pro hac vice*)
Armen Zohrabian (*pro hac vice* forthcoming)
Arun Ravindran (*pro hac vice* forthcoming)
Four Embarcadero Center, Suite 1400
San Francisco, CA  94104
Telephone: 415-766-3534
Facsimile:  415-402-0058
dhall@hedinhall.com
azohrabian@hedinhall.com
aravindran@hedinhall.com

*Lead Counsel for the Baidu Class and Co-Chair of the Executive Committee*

26

**POMERANTZ LLP**
Jeremy A. Lieberman
J. Alexander Hood II
James M. LoPiano
Brian Calandra
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8655
jalieberman@pomlaw.com
ahood@pomlaw.com
jlopiano@pomlaw.com
bcalandra@pomlaw.com

*Lead Counsel for the ViacomCBS and Tencent Classes and Executive Committee Member*

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
peretz@bgandg.com

*Additional Counsel for Named Plaintiff Kai Chen*

**THE SCHALL LAW FIRM**
Brian J. Schall
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Telephone: 310-301-3335
Facsimile:  213-519-5876
brian@schallfirm.com

*Executive Committee Member*

**BERGER MONTAGUE PC**
Michael Dell'Angelo
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000
mdellangelo@bm.net

*Co-Lead Counsel for the Gaotu Class & Executive Committee Member*

27

**JOHNSON FISTEL, LLP**
Ralph M. Stone
1700 Broadway, 41st Floor
New York, NY 10019
Telephone: (212) 292-5960
Facsimile: (212) 292-5680
RalphS@johnsonfistel.com

Michael I. Fistel, Jr. (*pro hac vice*)
40 Powder Springs Street
Marietta, GA 30064
Telephone: (470) 632-6000
Facsimile: (770) 200-3101
MichaelF@johnsonfistel.com

*Lead Counsel for the Vipshop Class & Executive Committee Member*

**GRANT & EISENHOFER P.A.**
Jay W. Eisenhofer
Daniel L. Berger
Caitlin M. Moyna
485 Lexington Avenue
New York, NY 10017
Telephone: (646) 722-8500
Facsimile: (646) 722-8501
jeisenhofer@gelaw.com
dberger@gelaw.com
cmoyna@gelaw.com

*Co-Lead Counsel for the Discovery Class & Executive Committee Member*

**ROSCA & SCARLATO LLC**
Alan L. Rosca (*pro hac vice*)
23250 Chagrin Boulevard, Suite 100
Beachwood, OH 44122
Telephone: (216) 570-0097
arosca@rscounsel.law

Paul Scarlato (*pro hac vice* forthcoming)
161 Washington Street, Suite 1025
Conshohocken, PA 19428
Telephone: 216-946-7070
pscarlato@rscounsel.law

*Co-Lead Counsel for the Gaotu Class*

28

**KIRBY McINERNEY LLP**
Ira M. Press
250 Park Avenue, Suite 820
New York, NY 10177
Telephone: 212-371-6600
ipress@kmllp.com

*Local Counsel for the Gaotu Class*