UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
CHEW KING TAN, Individually and on Behalf of :
All Others Similarly Situated,                               :
                                                             :   THIS DOCUMENT RELATES TO:
                         *Plaintiffs*,                       :   1:21-cv-08413-JSR
                                                             :   1:21-cv-08618-JSR
             - against -                                     :   1:21-cv-08752-JSR
                                                             :   1:21-cv-08897-JSR
                                                             :   1:21-cv-10286-JSR
GOLDMAN SACHS GROUP INC. and MORGAN :             1:21-cv-10791-JSR
STANLEY & CO. LLC,                                           :   1:22-cv-00169-JSR
                                                             :
                         *Defendants*.                       :   **OPINION & ORDER**
                                                             :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

JED S. RAKOFF, U.S.D.J.

      This Opinion and Order concerns a series of seven coordinated putative securities class actions (the "Archegos Cases") arising out of the demise of Archegos Capital Management, LP ("Archegos"). Archegos engaged in a market manipulation scheme with the stock of seven issuers (collectively, the "Issuers").[1] Using margin accounts and derivative contracts with defendants Morgan Stanley & Co. LLC ("Morgan Stanley") and Goldman Sachs Group, Inc. ("Goldman Sachs"), as well as other dealers, Archegos amassed controlling, non-public, and highly leveraged positions in the Issuers, dramatically increasing the Issuers' stock prices. However, when these stock prices moved against Archegos in March 2021, it was caught overexposed and unable to cover its bets. Upon learning of Archegos's imminent collapse, and before the news broke publicly, defendants sold billions of dollars of the manipulated Issuers' securities, thereby

---

[1] The seven issuers were Vipshop Holdings Ltd. ("Vipshop"); Gaotu Techedu Inc., formerly known as GSX Techedu Inc., ("Gaotu"); Tencent Music Entertainment Group ("Tencent"); ViacomCBS, Inc. ("ViacomCBS"); IQIYI, Inc. ("IQIYI"); Baidu, Inc. ("Baidu"); and Discovery, Inc. ("Discovery").

1

devastating share prices in those securities. The plaintiffs in the seven consolidated cases here, representing a putative class of investors in the manipulated stocks, allege that the defendants, by thereby front-running the market, engaged in insider trading in violation of §§ 10(b), 20A, and 20(a) of the Securities Exchange Act, 15 U.S.C. §§ 78t-1, 78j(b), & 78t(a), and SEC Rule 10b–5, 17 C.F.R. § 240.10b-5. Before the Court is defendants' renewed motion to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b)(1).

## BACKGROUND

Since the seven complaints in these cases are essentially identical, the Court, consistent with the briefing of the parties, will refer herein to *Tan v. Goldman Sachs*, No. 21 Civ. 8413 (JSR), as representative of all seven complaints. On March 31, 2023, the Hon. Paul Crotty, to whom these cases were originally assigned,[2] granted defendants motion to dismiss the First Amended Complaint ("FAC") with leave to amend. *Tan v. Goldman Sachs Grp. Inc.*, No. 21 Civ. 8413 (PAC), ECF No. 62, 2023 WL 2753238 (S.D.N.Y. Mar. 31, 2023). The Court assumes familiarity with this prior decision and recites only the facts necessary to determine the instant motion. The following facts are taken from the representative Second Amended Complaint ("SAC"), ECF No. 66, and documents incorporated therein and are assumed to be true for the purposes of deciding the motion. *See Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007).

I.  **Archegos's Rise**

In 2001, Sung Kook ("Bill") Hwang founded Tiger Asia Management, LLC and Tiger Asia Partners, LLC (collectively, "Tiger Asia"), a hedge fund valued at more than $5 billion. SAC ¶ 28.

---

[2] The cases were reassigned to the undersigned on February 29, 2024, but substantial credit for the instant Opinion & Order must be given to Judge Crotty and his able law clerk, Kevin Green, who had prepared the full first draft prior to the reassignment.

In 2012, Hwang faced civil and criminal charges for insider trading and market manipulation. *Id.* ¶¶ 29–32. The resolution of these charges resulted in substantial penalties, including a requirement that Hwang be banned from managing money on behalf of clients for at least five years. *Id.* ¶ 31. Accordingly, Hwang returned all outside investor capital in Tiger Asia, and in 2013 he converted Tiger Asia into Archegos, a "family office" devoted to managing his own wealth. *Id.* ¶ 33.

In the spring of 2020, Archegos began a massive market manipulation scheme by acquiring non-public and concentrated holdings in several mid-to-small cap companies. *Id.* ¶ 81. The key to Archegos's scheme was a kind of synthetic financing known as a total return swap ("TRS"). Pls.' Mem. Law Opp'n Defs.' Mot. Dismiss ("Pls.' Opp.") 5, ECF No. 71. A TRS is a derivative contract that allows a client (here, Archegos) to acquire the benefits of owning an asset without actually buying it. SAC ¶ 40. A TRS entitles a client to receive payments on the total return of a referenced asset in exchange for paying fees and posting collateral. *Id.* If the value of the asset increases, the counterparty pays the client the increase; if the price falls, the client pays the counterparty to make up for the decline. *Id.* Thus, the client enjoys all the benefits and risks of owning the referenced asset without actually purchasing it. *Id.* The utility of the TRS is leverage. *Id.* ¶ 45. With relatively little up-front capital, the client is able to "own" substantially greater amounts of the shares of an asset, thereby amplifying any eventual returns. *Id.*

In order to stay "market neutral," TRS counterparties typically hedge the assets referenced in a TRS. *Id.* ¶ 41. To do this, counterparties purchase, on their own, the shares referenced in the TRS as "proprietary hedged shares." *Id.* Accordingly, if the referenced shares increase in value and the counterparty owes greater payments to the client, those costs are offset by the increase in the counterparties' proprietary hedged shares. *Id.* ¶ 42. Conversely, if the prices decline, any loss in value is offset by the payments owed by the clients. *Id.* In either case, price fluctuations have

no impact on the counterparties. Counterparties are thus able to keep the fees generated by the TRS as profits without exposure to market changes. *Id.*

In 2020 and 2021, defendants and several other brokers acted as counterparties in TRS agreements with Archegos. *Id.* ¶ 101. These TRSs unlocked massive amounts of liquidity for Archegos, which went on a shopping spree, purchasing vast quantities of stock in the Issuers. *Id.* ¶ 83. From July 2020, about the time Archegos began to enter these TRS agreements, to March 2021, Archegos increased its holdings in these companies from roughly $7 billion to $96.7 billion. *Id.* ¶ 82. By March of 2021, it beneficially owned 30%–70% of the Issuers' stock. *Id.* ¶ 83. Such a rapid and concentrated increase in trading volume in the Issuers companies caused their stock prices to soar, reaping huge returns for Archegos and substantial fees for its prime brokers. *Id.* ¶¶ 105, 110.

In addition to liquidity, these TRS agreements offered Archegos anonymity. Because Archegos's holdings were primarily through derivative TRS agreements, it never actually "owned" much of the Issuers' stock. *Id.* ¶ 100. This structure allowed Archegos to evade SEC reporting requirements and concealed from the market that a single investor controlled massive amounts of stock in several concentrated companies through highly-levered transactions. *Id.* ¶¶ 91, 100. In other words, no one, including the Issuers themselves, knew why trading volume and share prices had increased in these respective stocks. *Id.* ¶ 100. By concealing its strategy, Archegos dodged scrutiny from short sellers and regulators, which facilitated its ability to quietly increase share prices and its holdings in the Issuers stock. Pls.' Opp. 5.

II. **Archegos's Fall**

Early in the week of March 22, 2021, however, prices in the Issuers' securities moved against Archegos. SAC ¶¶ 142–45. Initially, Archegos attempted to defend its positions by

pumping hundreds of millions of dollars into the Issuers, but by the close of business on March 23, it had lost over $3 billion. *Id.* ¶ 143. On March 24, the situation worsened still further. Share prices continued to slip and Archegos's brokers began escalating margin calls. *Id.* ¶ 147. By the end of the business day on March 24, Archegos had lost another $16 billion—a one-day loss of 48%. *Id.* By close of business on March 25, Archegos had lost another $9.2 billion and received another $10.7 billion worth of margin calls, which it could not meet. *Id.* ¶¶ 148, 152.

After the markets closed on March 25, Archegos organized a group call with its largest prime brokers, including defendants. *Id.* ¶ 153. Archegos informed its counterparties that it had roughly $10 billion in equity and $120 billion in gross exposure. *Id.* To thwart a fire sale of the Issuers' stock that would devastate prices, Archegos asked its brokers to enter into a standstill agreement whereby they would not declare Archegos in default so that it could wind down its positions in an orderly manner. *Id.* Plaintiffs allege that Archegos's disclosure of its financial crisis provided defendants with material non-public information. *Id.*

Defendants did not bite at Archegos's plan for an orderly winddown. *Id.* ¶ 181. On March 26, defendants triggered events of default and early termination rights against Archegos and unloaded $20 billion in Archegos related positions, cratering share prices. *Id.* ¶¶ 180–81. All told, in the days following March 25, defendants sold 90% of their Archegos related positions. *Id.* ¶ 174. These sales comprised both Archegos's posted collateral and defendants' proprietary hedged shares. *Id.* ¶ 186. By rushing to offload their Archegos related positions, defendants emerged from the crisis "essentially unscathed." *Id.* ¶ 189. Everyone else lost billions. *Id.* ¶ 14.

### III. The Court's Prior Dismissal and the Second Amended Complaint

On June 13, 2022, plaintiffs filed their FAC in these coordinated actions, bringing the same causes of action at issue here. ECF No. 54. The FAC pursued three theories of liability. First,

under a misappropriation theory, plaintiffs argued that defendants breached their duty to Archegos by front-running the market and by tipping preferred clients once they learned of Archegos's imminent collapse. *Tan,* 2023 WL 2753238, at *5. Second, under a tipper/tippee theory, plaintiffs alleged that defendants breached a duty to the shareholders of the Issuers by their fire sale based on non-public information. *Id.* at *7. Finally, in addition to the foregoing fraud claims under § 10(b) of the Securities Exchange Act and Rule 10b–5 promulgated thereunder, plaintiffs brought derivative causes of action under Section 20A and 20(a) of the Securities Exchange Act, alleging "control person liability" pursuant to Section 20(a), and alleging that plaintiffs traded the Issuers' stocks contemporaneously with defendants' illicit trades, entitling plaintiffs to relief pursuant to Section 20(A). *Id.* at *9–10.

On March 31, 2023, the Court dismissed the FAC in its entirety. *See id.* In rejecting plaintiffs' misappropriation theory, the Court found that plaintiffs failed to "allege a deceptive or manipulative device," employed by defendants because plaintiffs did "not point to a single trade executed by Defendants where they did not *disclose the trade to Archegos*," the putative victim of the misappropriation. *Id.* at *5–6. The Court also held that the FAC failed to allege that Archegos shared confidential information in order "to seek a personal benefit." *Id.* at *8. As to the tipper/tippee claims, the Court further "decline[d] to credit plaintiffs vague assertion that defendants 'may have' tipped off preferred hedge fund clients" because plaintiffs failed to identify "specific sales connected to these tips" or "the circumstances of the tips themselves." *Id.* *6 n.5. Finally, because the Court found that plaintiffs failed to state a claim for a primary violation of the Securities Exchange Act, it dismissed the secondary Section 20A and 20(a) claims. *Id.* at *9–*10. All these dismissals, were, however, without prejudice to plaintiffs filing a second amended complaint to try to cure these deficiencies.

On May 16, 2023, plaintiffs filed their coordinated SAC. To try to cure the defects with their prior tipper/tippee claim, the SAC adds numerous allegations. For example, the SAC alleges that once in crisis, Archegos provided confidential information to defendants with the expectation that defendants would trade on the information in an orderly and controlled manner, thus benefiting Archegos. *Id.* ¶¶ 9–10. Or, to give another example, the SAC adds allegations that certain of defendants' employees overseeing the trades of preferred customers were subsequently terminated, indicating that defendants tipped preferred customers in advance of Archegos's collapse. *Id.* ¶¶ 205–07. The SAC further alleges that defendants did not disclose to Archegos that they would sell their proprietary hedged shares, demonstrating that defendants deceived Archegos by trading on its confidential information. *Id.* ¶ 205. Defendants then renewed their motion to dismiss, now directed at the SAC. Plaintiffs replied, and defendants in turn filed a brief rebuttal. ECF Nos. 71, 72. The Court finds the matter suitable for determination on the papers and without oral argument, pursuant to Rule 78(b), Fed. R. Civ. P.

## DISCUSSION

Plaintiffs' basic allegations in the SAC have not changed. Archegos, through derivative contracts with defendants and other dealers, pumped the stock of seven issuers. When it became overexposed and unable to meet its growing margin calls, Archegos asked defendants not to sell their Archegos related positions. Defendants declined, sold their positions, and share prices plummeted. The crux of plaintiffs' complaint is that defendants engaged in insider trading because they sold (and tipped) before news of Archegos's demise became public. However, as with the FAC, plaintiffs fail to allege the critical element of insider trading, i.e., that defendants misappropriated confidential information in breach of fiduciary like duties, and thus their insider trading claim fails. *See United States v. Pinto-Thomaz*, 352 F. Supp. 3d 287, 296 (S.D.N.Y. 2018)

("Insider trading occurs when someone to whom [confidential information] has been entrusted pursuant to a fiduciary or similar relationship secretly embezzles, or 'misappropriates,' the information in order to take advantage of its securities-related value.").

As an initial matter, plaintiffs have failed to allege that defendants traded on confidential information. The purported confidential information here concerns the details of Archegos's swaps with defendants and the news of Archegos's demise. SAC ¶ 118. However, to be confidential for the purposes of insider trading, the information must be generated and maintained for a company's "exclusive right and benefit." *Carpenter v. United States*, 484 U.S. 19, 26 (1987); *see also United States v. Mahaffy*, 693 F.3d 113, 135 n.14 (2d Cir. 2012) ("*Carpenter* requires proof that the information was both considered and treated by [the source] in a way that maintained the [source's] exclusive right to the information."). Here, the SAC alleges that defendants were entitled by contract to trade away their Archegos related positions in the event of Archegos's default, SAC ¶ 154, thus the news of its default, which Archegos voluntarily disclosed, was not for Archegos's "exclusive use." As Archegos had no exclusive right to the information, the information was not confidential, and defendants' trades upon the information cannot give rise to liability for insider trading.

Even were the information Archegos disclosed confidential, plaintiffs fail to allege that defendants' trades breached any purported duty, independently dooming their claim. Defendants breached no duty to the Issuers because Archegos was not an insider of the Issuers. Absent plausible allegations that Archegos owed duties to the Issuers as a corporate insider, defendants could not assume any duty from Archegos to disclose or abstain from trading. *Dirks v. S.E.C.*, 463 U.S. 646, 659 (1983) ("[T]he tippee's duty to disclose or abstain is derivative from that of the insider's duty."). Nor did defendants breach any purported duty to Archegos by trading in the

wake of its collapse. As the Court held in dismissing the FAC, defendants disclosed their intent to trade upon declaring Archegos in default, and thus did not deceive Archegos by trading away their Archegos related positions. *See United States v. O'Hagan*, 521 U.S. 642, 654 (1997) ("Deception through nondisclosure is central to the [misappropriation] theory of liability . . . ."). For these reasons, and for the more detailed reasons provided below, the Court grants defendants' motion to dismiss the SAC as plaintiffs have failed, once again, to state a cause of action for insider trading.

### I.  Legal Standard for a Motion to Dismiss

When considering a Rule 12(b)(6) motion, the Court accepts as true all factual allegations contained in the complaint and draws all reasonable inferences in the plaintiff's favor. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). The Court does not "assay the weight of the evidence which might be offered," but rather the complaint's "legal feasibility." *Lopez v. Jet Blue Airways*, 662 F.3d 593, 596 (2d Cir. 2011) (internal quotation marks and citations omitted). However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Allegations of securities fraud must also meet the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure. In alleging fraud or mistake, a party must state "with particularity the circumstances constituting fraud or mistake." *ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009). Under this standard, plaintiffs alleging fraud must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI Commc'ns*, 493 F.3d at 99.

Finally, a securities fraud complaint pursued by private parties must also meet the heightened pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b), which requires that a viable securities fraud complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," or "scienter," with respect to each act or omission. 15 U.S.C. § 78u-4(b)(2). That requisite state of mind is "an intent 'to deceive, manipulate, or defraud.'" *ECA*, 553 F.3d at 198 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007)). "[T]he inference of scienter must be more than merely 'reasonable' or 'permissible'"; it must be "at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. In the Second Circuit, the requisite scienter "can be established by alleging facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *In re MRU Holdings Sec. Litig.*, 769 F. Supp. 2d 500, 514–15 (S.D.N.Y. 2011).

## II.     Violations of Rule 10b–5

"Insider trading—unlawful trading in securities based on material non-public information—is well established as a violation of section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5." *SEC v. Obus*, 693 F.3d 276, 284 (2d Cir. 2012). There are two theories of insider trading. "Under the classical theory of insider trading, a corporate insider is prohibited from trading shares of that corporation based on material non-public information in violation of the duty of trust and confidence insiders owe to shareholders." *Id.* "A second theory, grounded in misappropriation, targets persons who are not corporate insiders but to whom material non-public information has been entrusted in confidence and who breach a fiduciary duty to the source of the information to gain personal profit in the securities market." *Id.* Under either theory, "[o]ne

who has a fiduciary duty of trust and confidence" to either a company's shareholders or to the source of confidential information, and who "is in receipt of material non-public information has a duty to abstain from trading or to disclose the information publicly." *Id.* at 285. Here, plaintiffs proceed under both theories.

### A. Classical Liability

Plaintiffs first allege liability under a classical theory of insider trading, claiming that defendants were tippees of Archegos, and that Archegos owed a fiduciary duty to the Issuers that defendants breached by trading on the information supplied by Archegos. A tippee—the recipient of confidential information who is not himself a corporate insider—is liable for insider trading if "(1) the tipper breached a duty by tipping confidential information; (2) the tippee knew or had reason to know that the tippe[r] improperly obtained the information (i.e., that the information was obtained through the tipper's breach); and (3) the tippee, while in knowing possession of the material non-public information, used the information by trading or by tipping for his own benefit." *Obus*, 693 F.3d at 289.

First, plaintiffs' classical theory fails because they have not alleged that Archegos shared the Issuers' confidential information. "[I]nsider trading is a variation of the species of fraud known as embezzlement, which is defined in Black's Law Dictionary as '[t]he fraudulent taking of personal property with which one has been entrusted, especially as a fiduciary.'" *Pinto-Thomaz*, 352 F. Supp. 3d at 295–96 (quoting Black's Law Dictionary (10th ed. 2014)). In the context of insider trading, the property is "a company's material confidential information." *Id.*; *see also O'Hagan*, 521 U.S. at 654 ("A company's confidential information . . . qualifies as property to which the company has a right of exclusive use."). "Insider trading occurs when someone to whom this property has been entrusted pursuant to a fiduciary or similar relationship secretly embezzles

11

. . . the information in order to take advantage of its securities-related value." *Id.* Thus, to breach a duty, an insider must trade (or tip) on confidential information that "belongs to the firm itself." *United States v. Martoma*, 894 F.3d 64, 73 (2d Cir. 2017) ("A firm's confidential information belongs to the firm itself, and an insider entrusted with it has a fiduciary duty to use it only for firm purposes. The insider who personally benefits—i.e., whose purpose is to help himself—from disclosing confidential information therefore breaches that duty . . . .").

Here, none of the information that Archegos allegedly tipped to the defendants belonged to the Issuers. The information that Archegos allegedly tipped—the terms of its swaps and margin accounts with defendants and the news of its demise—was Archegos's own information resulting from its own trading with defendants. *See* SAC ¶ 118 (describing the purported confidential information). As alleged in the SAC, this information was entirely unknown to the Issuers. *See* SAC ¶ 100 (alleging that "no one knew" that Archegos "controlled massive amounts of stock in several companies or that it achieved this control through highly-levered transactions"). Information that concerned *Archegos's* trading and liquidity, which was entirely unknown to the Issuers, did not "belong" to the Issuers. As it was not the Issuers' information, Archegos breached no duty to the Issuers by sharing the information with defendants. Absent such a breach, defendants had no duty to the Issuers to disclose or abstain from trading, dooming plaintiffs' classical theory of liability.

Even if the information could somehow be said to have belonged to the Issuers, plaintiffs' classical theory would still fail because plaintiffs do not plausibly allege that Archegos was an insider of the Issuers, i.e., owed fiduciary like duties to the Issuers' shareholders.[3] *See Dirks*, 463

---

[3] In its previous decision, the Court noted that it was "difficult to discern whether or not Archegos was an insider for the purposes of insider trading law." *Tan*, 2023 WL 2753238, at *8. However, because of its control over the Issuers' share prices, the Court found "Archegos's insider status to

U.S. at 654 ("[T]here is no general duty to disclose before trading on material nonpublic information .... Such a duty arises rather from the existence of a fiduciary relationship." (citing *Chiarella v. United States*, 445 U.S. 222, 235 (1980)). Here, plaintiffs allege that Archegos was an insider because it was a "controlling shareholder" of the Issuers. SAC ¶ 291. They argue that Archegos had "far more practical control over the Issuers and their stock than most insiders do, such as a lone director or mid-level executive." Pls.' Opp. 12. Because of their control of the price of the Issuers' stock, plaintiffs insist that Archegos had "general fiduciary duties" to the Issuers, "including not to act against the corporation's interests by trading on or exploiting MNPI involving the corporation." *Id.* at 13.

Plaintiffs' argument ignores that insider status as a controlling shareholder does not arise from stock ownership alone. Such duties arise because controlling shareholders "have the same sort of access to information as a result of their position of power as the typical officer and director." *Steginsky v. Xcelera Inc.*, 741 F.3d 365, 370 (2d Cir. 2014). As the Supreme Court noted in *Chiarella*, the obligation to maintain the corporation's confidences derives from "the existence of a relationship affording access to inside information intended to be available only for a corporate purpose." 445 U.S. at 227. In keeping with this standard, courts require either that a controlling shareholder has access to confidential corporate information or control over corporate affairs before imposing fiduciary obligations to abstain from insider trading. *Compare Gruber v.*

---

[be] 'plausible.'" *Id.* It then went on to dismiss the claim because plaintiffs failed to allege that Archegos tipped MNPI for a personal benefit. *Id.* Plaintiffs now argue that the Court's ruling on Archegos's insider status is the "law of the case and should not be revisited now." Pls. Opp. 12. The Court disagrees. "[D]ictum is not the law of the case." 18B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 4478 (3d ed. 2023). The Court dismissed the prior tipper/tippee claim for the independent reason that plaintiffs had failed to allege a personal benefit, thus its suggestion about Archegos's insider status was not necessary to the outcome and is nonbinding. *See Haddad v. Alexander, Zelmanski, Danner & Fioritto, PLLC*, 758 F.3d 777, 781 (6th Cir. 2014) ("If the statement is not necessary to the outcome, it is dicta and nonbinding.").

*Gilbertson*, No. 16 Civ. 9727, 2021 WL 2482109 (S.D.N.Y. June 17, 2021) (finding that controlling shareholders were corporate insiders where they were "part of the day-to-day business," responsible for appointing directors, "direct[ing] financial decisions," and negotiating payments on the corporation's behalf), *with Sawant v. Ramsey*, 742 F. Supp. 2d 219, 238 (D. Conn. 2010) (holding that a "major shareholder" was not an insider where they were not a consultant or advisor, did not "participate in the development, marketing, or business planning," and communicated with the corporation solely in their "capacity as a shareholder").

Here, Archegos's beneficial holdings made them "controlling shareholders" in only an attenuated sense without insider access akin to a director or officer. As detailed *supra*, Archegos established dominant positions in the Issuers primarily through derivative contracts where defendants legally owned the Issuers' shares on Archegos's behalf. SAC ¶¶ 97–100. Although Archegos economically "owned" much of the Issuers' stock, it enjoyed none of the control or access typically afforded to controlling shareholders. It could not vote its shares, had no contact with the Issuers, had no access to the Issuers' confidential information, and did not influence corporate affairs. The only influence Archegos had was over share price, which it manipulated in the marketplace entirely apart from, and unknown to, the Issuers themselves. This was not a "relationship affording access to inside information intended to be available only for a corporate purpose," *Chiarella*, 445 U.S. at 227; it was a surreptitious plot to pump and dump the Issuers' stock. While this was no doubt a devious scheme, "not every instance of financial unfairness constitutes fraudulent activity under § 10(b)." *Id.* at 232. Here, because Archegos executed its plot from the outside, it cannot be liable for tipping secrets from the inside. Put another way, even if Archegos could be said to partly control the price of the Issuers' stock, Archegos lacked access

to the Issuers' confidential information and, indeed is not have alleged to have disclosed the Issuers' confidential information, but only its own for similar reasons.

In sum, Plaintiffs have failed to plausibly allege that Archegos owed relevant fiduciary duties to the Issuers, received material nonpublic information from the Issuers, or disclosed the Issuers' confidential information to the defendants. The failure to adequately allege any of these elements, let alone all of them, is fatal to plaintiffs' claim of classical insider trading premised on the defendants being tippees of the Issuers' information.

### B. Misappropriation Liability

Plaintiffs alternatively allege liability under a misappropriation theory of insider trading relating not to the Issuers' confidential information but to Archegos's. Under this theory, a person who is not an insider may commit insider trading by using confidential information in breach of "a fiduciary duty to the source of the information to gain personal profit in the securities market." *Obus*, 693 F.3d at 284. To allege liability under a misappropriation theory, a plaintiff must establish "(1) that the defendant possessed material, nonpublic information; (2) which he had a duty to keep confidential; and (3) that the defendant breached his duty by acting on or revealing the information in question." *S.E.C. v. Lyon*, 605 F. Supp. 2d 531, 541 (S.D.N.Y. 2009). Here, plaintiffs aver that defendants breached their purported duty to Archegos by offloading their proprietary hedged shares and by tipping preferred clients after learning of Archegos's imminent collapse. SAC ¶¶ 205–15.

As with plaintiffs' classical claim, plaintiffs' misappropriation claim fails to adequately allege the first element: that Archegos tipped defendants with confidential information. As noted *supra*, information is confidential when it is generated and maintained for a company's "exclusive right and benefit." *Carpenter*, 484 U.S. at 26; *see also O'Hagan*, 521 U.S. at 654 ("A company's

confidential information . . . qualifies as property to which the company has a right of exclusive use."). Here, the SAC alleges that defendants were entitled by contract to "seize and sell [Archegos]'s margin or collateral" and to "unwind its transactions with [Archegos]" in the event of default. SAC ¶ 154. Further, Archegos voluntarily "organized a group call with its largest Prime Brokers" to disclose this information and to request a "standstill" agreement. SAC ¶ 153. Archegos, therefore, did not have "exclusive use" of the alleged confidential information, as its default vested defendants with the right to trade away their positions. Moreover, that it volunteered this information demonstrates that it did not regard the information as confidential. Sharing information that was not for Archegos's exclusive use, nor regarded by Archegos as confidential, does not give rise to a duty to disclose or abstain from trading. *See Mahaffy*, 693 F.3d at 135 n.14 ("*Carpenter* requires proof that the information was both considered and treated by [the source] in a way that maintained the [source's] exclusive right to the information.").

Even if the information Archegos voluntarily disclosed was confidential, plaintiffs have failed to allege that defendants committed a fraud upon Archegos by selling their shares, because, as with the FAC, defendants disclosed their trades to Archegos before trading. *See O'Hagan*, 521 U.S. at 654 ("Deception through nondisclosure is central to the [misappropriation] theory of liability . . . ."). As alleged in the SAC, defendants sold their Archegos related positions only after "trigger[ing] events of default or early termination rights against Archegos" thus putting Archegos on notice of their intent to trade. SAC ¶ 155. Indeed, the very fact that Archegos convened a meeting to ask defendants not to trade demonstrates that Archegos understood that defendants could and would sell absent such an agreement.

Plaintiffs' latest argument is that Archegos only expected defendants to sell its TRS related collateral, and that defendants' sale of their proprietary hedged shares was "wholly outside of

16

Archegos's direction or knowledge." Pls.' Opp. 23. But this argument is directly contradicted by the SAC's allegations that "Archegos understood" and "depended" on the defendants hedging strategy "to increase the market price of the Issuers' stock." SAC ¶ 167. As defendants' proprietary hedges were known to Archegos, and entirely bound up in Archegos's swaps, Archegos was sufficiently on notice that defendants would close out their hedges when they terminated the swaps upon Archegos's default. *See id.* ("[I]n connection with Archegos's disclosure to Defendants of [its default], Archegos expected, or should have expected, that Defendants were positioned to likely trade the Issuers' stock."). As the Court found in dismissing the FAC, "[w]hen Defendants issued default notices on March 26, Archegos was assuredly on notice that they intended to trade . . . ."). *Tan*, 2023 WL 2753238, at *7. And this is true even assuming the doubtful proposition that defendants had a duty to keep confidential the information Archegos disclosed to them in its plea for help. Accordingly, Plaintiffs' misappropriation theory fails to the extent it posits Archegos as the victim.

Plaintiffs' alternative misappropriation theory is that defendants tipped preferred clients prior to Archegos's collapse in breach of its fiduciary duty to its other clients. While theoretically this theory has some appeal, plaintiffs have failed to allege adequate facts to support it, even now on their third try. To support this theory, plaintiffs allege in the SAC that: (1) trading volume in the Issuers stock increased on March 24; (2) the stock price of Discovery shares declined before Morgan Stanley priced block trades; (3) that employees overseeing these trades were later terminated; and (4) that the Securities and Exchange Commission and the Department of Justice are probing insider trading claims related to these trades. SAC ¶¶ 205–13. But as in the case of the FAC, the Court once again finds that these allegations do not plausibly suggest that defendants

tipped preferred customers regarding Archegos's demise, let alone with the enhanced pleading requirements here applicable. *Tan*, 2023 WL 2753238, at *6 n.5.

To state such a claim, plaintiffs "must plead the alleged trading scheme with particularity." *In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 354 (S.D.N.Y. 2008). Here, "Plaintiffs point to no specific sales connected to these tips, nor the circumstances of the tips themselves." *Tan*, 2023 WL 2753238, at *6 n.5. They ask this Court to infer that because trading volume increased and because stock prices fell, it must be because defendants tipped some unidentified preferred clients, who in turn made unidentified trades on the tip. But even aside from the total lack of particularity, this inference is entirely at odds with plaintiffs' own allegations that on March 24, Archegos itself "directed hundreds of millions of dollars of additional trading in [the Issuers] in a fleeting effort to defend these stock prices." SAC ¶ 146. Without particular factual allegations regarding the tips, it is an entirely conjectural leap to disregard Archegos's flurry of trading activity and instead to attribute the movement in the Issuers' stocks to improper unidentified trading by defendants' unidentified tippees. Thus, plaintiffs' theory is not only implausible on the face of the SAC, but has in any case woefully failed to satisfy the heightened pleading requirements of Rule 9(b) and the PSLRA.

### III. Sections 20A and 20(a)

Plaintiffs bring claims under both Sections 20A and 20(a) of the Exchange Act. "To state a claim under Sections 20(a) and 20A of the Exchange Act, a plaintiff must allege a primary violation, such as one under Section 10(b) and Rule 10b–5." *Arkansas Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 356 (2d Cir. 2022). As plaintiffs here have failed to state claims under Section 10(b) and Rule 10b–5, they have *ipso facto* failed to allege violations of Sections 20A and 20(a) of the Exchange Act.

## **CONCLUSION**

For the foregoing reasons, defendants' motion to dismiss is now granted with prejudice. The Clerk of the Court is respectfully directed to close and enter final judgment in each of the following related cases, dismissing the complaints with prejudice: 1:21-cv-08413-JSR; 1:21-cv-08618-JSR; 1:21-cv-08752-JSR; 1:21-cv-08897-JSR; 1:21-cv-10286-JSR; 1:21-cv-10791-JSR; 1:22-cv-00169-JSR.

Dated: New York, New York
April 1, 2024

SO ORDERED

*/s/ Jed S. Rakoff*
JED S. RAKOFF
United States District Judge